IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANTHONY SANSONE,      )
      )
      Plaintiff,      )
      )
      v.      )      Case No. 13 C 3415
      )
PATRICK DONAHOE,      )
Postmaster General,[1]      )
      )
      Defendant.      )

## MEMORANDUM OPINION AND ORDER

Anthony Sansone ("Sansone") has charged Postmaster General Patrick Donahoe with a failure to accommodate and with constructive discharge, both in asserted violation of the Rehabilitation Act, 29 U.S.C. § 791 et seq.[2] Now before this Court are the parties' Fed. R. Civ. P. ("Rule") 56 cross-motions for summary judgment. For the reasons set out more fully below, Sansone's motion for summary judgment is denied, while the Postmaster General's motion is denied as to Sansone's failure-to-accommodate contention and is granted as to his claim of constructive discharge.

---

[1] Initially the Complaint in this action named both Postmaster General Donahoe and the United States Postal Service ("Postal Service") as defendants. After the cross-motions for summary judgment dealt with in this opinion were filed, this Court granted leave for the Complaint to be amended by Dkt. No. 50 to address two matters that did not significantly impact consideration of the cross-motions: (1) to fix a typographical error and (2) to delete the Postal Service as a defendant because it had been improperly added to the litigation. This opinion addresses the Complaint as so amended.

[2] All further references to Title 29's provisions will simply take the form "Section --," omitting the prefatory "29 U.S.C. §."

## Standard of Review

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).[3] For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir.2002)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir.2008)) and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (id.). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

As with any summary judgment motion, this Court must regard the nonmovant's version of any disputed facts as true, but only so long as it is supported by record evidence.[4] Where as

---

[3] At the summary judgment stage, of course, the nonmovant need not "establish" or "show" or "prove" anything to defeat the opposing party's motion, but must merely demonstrate that a genuine issue of material fact exists. This opinion employs the quoted terms only because the cited cases use that terminology, but it imposes on each nonmovant the lesser burden described earlier in this footnote.

[4] This District Court's LR 56.1, adopted to implement Rule 56, requires parties to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which facts are agreed upon. This opinion cites to Sansone's LR 56.1 statement as "S. St. ¶," to the Postmaster General's LR 56.1 statement as "P.G. St. ¶" and to the parties' responses as "S. Resp. ¶ --" and "P.G. Resp. ¶ --" respectively. Citations to the parties' supplemental statements of facts take the form "S. Supp. ¶ --" and "P.G. Supp. ¶ --." Where a party's response does not provide a version of the facts different from the original statement, this opinion cites only that original statement. Another convenient shorthand employed here is to cite the current version of the Complaint, the Second Amended Complaint, as "SAC." Finally, because this opinion makes only a single reference to one of the memoranda filed by the litigants, Sansone's submission in support of his motion, that reference is simply cited "S. Mem."

here cross-motions for summary judgment are involved, the principles of Rule 56 call for a dual perspective that this Court has sometimes described as Janus-like: As to each motion the nonmovant's version of any disputed facts must be credited, an arrangement that sometimes causes the denial of both motions.

## Facts[5]

Sansone suffers from multiple sclerosis that caused him to lose virtually all use of his legs in 1999, rendering him wheelchair-bound (S. St. ¶¶ 7-8). Sansone contends that the Postal Service failed to accommodate him in 2011when it revoked the parking accommodation he had held for over a decade and failed to replace that accommodation with a parking spot that ensured his access to his workplace (SAC ¶¶ 8-9, 12).

At the time of the events at issue Sansone had worked for over 30 years at the Postal Service's Bulk Mail Center ("BMC") in Forest Park, Illinois and had been the supervisor of maintenance there since 1997 (P.G. St. ¶¶ 1-2). In his entire time with the Postal Service Sansone never received any kind of warning or reprimand about his job performance (S. St. ¶ 22).

After he lost the use of his legs, Sansone drove to work each morning in a specially equipped van that he could operate entirely with his hands (id. ¶ 10) and that had a ramp that deployed from the passenger side to enable Sansone to enter and leave the van in his wheelchair

---

[5] Unless this opinion specifically ascribes a fact to one party, designates a fact as agreed to solely for the purposes of summary judgment or indicates that the fact is disputed, the following statement constitutes an order pursuant to Rule 56(g) setting forth material facts that are not genuinely in dispute. Those facts shall be treated as established for the purposes of trial, and counsel for the parties are ordered to include them in the statement of agreed facts that is a component of the joint proposed final pretrial order that this District Court requires to set the game plan for trial.

(id.). To accommodate the van and ensure that Sansone could easily enter and leave the BMC, the Postal Service permitted him to park in a specific space on the western side of the BMC between dock doors 29 and 30 (P.G. Resp. ¶ 12). That space was special because it was next to a marked crosswalk, leaving sufficient space to deploy the wheelchair ramp (id.).[6] It was also adjacent to a loading ramp that extended from ground level to an automated doorway, permitting Sansone to come into and go out of the building with ease (id. ¶¶ 12-13). Once in the building Sansone switched from his wheelchair to a motorized scooter, which facilitated his ability to move around the BMC and to operate manual doors (P.G. St. ¶ 16).

In response the Postmaster General contends that the parking spot was unsafe. It was located in an area that was used daily by other vehicles, including spotter trucks (like semitrailer trucks), pickup trucks and maintenance vehicles (P.G. St. ¶ 14). As for the ramp that Sansone used to enter the building each day, it was itself shared with forklifts, scooters, flatbed trucks and maintenance vehicles (id.). In June 2011, moreover, OSHA fined the Postal Service citing a number of hazards, including the facts that semitrailer truck drivers were pulling away from the loading docks without green lights and that managers were permitting inexperienced drivers to operate forklift trucks without proper training and certification (Branch Dep. Ex. 29).[7] To go from his parking space into the BMC Sansone had to travel along the loading docks in a region

___

[6] In that respect the Postmaster General disputes Sansone's position that he could be assured there would be enough space next to his van to deploy the ramp, a dispute advanced on the ground that the parking area was also used by other vehicles (id. ¶ 12). That however does not rebut Sansone's assertion that the parking space ran adjacent to a crosswalk into which there was plenty of space to deploy the ramp (see Sansone Dep. 56:4-56:16).

[7] It is true that the BMC was not cited for anything as to (1) Sansone's specific parking location, (2) his use of the ramp or (3) his parking along the western dock area -- but the safety hazards noted by OSHA might still have led a supervisor to worry generally about vehicle operation and parking lot safety near the BMC (see Branch Dep. 48:16-48:20).

- 4 -

where semitrailer trucks pulled in and out in a hurry (P.G. St. ¶ 16). Moreover, even apart from the OSHA fine, an employee had been hit by a truck near the docks in 2006 (S. Resp. ¶ 19). Plant Manager Ruby Branch ("Branch") had also noticed an increase in vehicle traffic in the area (id.).

Shortly after OSHA fined the BMC, Branch -- who had worked there only since 2010 -- noticed that a van was parked on the west side of the building and, on discovering it was Sansone's, decided that he should not park there any longer (S. Resp. ¶¶ 6, 19). Sansone learned of Branch's decision via a message from his direct manager Chuck von Rhein ("von Rhein"), who had in turn learned of Branch's decision through his manager LaShawn Jacobs ("Jacobs") (S. St. ¶ 29; P.G. St. ¶ 5). Sansone contends that when he first learned that his spot was revoked the Postal Service did not offer him any alternate accommodation, but Branch testified that she instructed Jacobs that Sansone should either park in a general handicap space in front of the BMC or in Branch's own reserved space on the western side of the BMC, near the Motor Vehicle Office (hereafter "MV Office") (S. Resp. ¶ 20; Branch Dep. 53:10-54:2).

On learning that his parking accommodation had been revoked, Sansone wrote to Jacobs and articulated two needs. First he explained that he needed a handicap parking space with enough space on the side for him to let his ramp down (S. St. ¶ 30), and second he explained that he has difficulty in opening doors manually while in his wheelchair without damaging the doors or his chair, so he asked that the entrance be made handicap-accessible (id.). Jacobs wrote this back to Sansone (id. ¶ 31):

> After discussing this with Plant Manager Branch, there is handicap parking available in the front of the building and parking by Motor Vehicle both with ramp access. If you have any concerns she is available to meet.

Rather than going in to speak with Branch, Sansone simply responded with this September 14 e-mail to Jacobs (P.G. Resp. ¶ 37):

> Your correct, there are a couple spots up front with provisions for me to let my ramp down. Hopefully when I come in one will be open, if not???? Also what about provisions for automatic doors? Or doesn't that matter?

Sansone was concerned about having a reserved spot because, as he testified, "those spots [in front] get taken up by anybody and everybody, the handicap spots. There is only a few that will accommodate my ramp" (Sansone Dep. 224:18-225:1).

Sansone did not address the option to park in the MV Office area because none of those spaces were designated as a handicap space (P.G. Resp. ¶ 36), and he also says they did not leave enough room for him to let his ramp down (Sansone Dep. 139:5-139:7).[8] On that score the Postmaster General contends that if there was indeed insufficient room for Sansone, Branch could easily have directed the other vehicles to move because all the vehicles that parked in that area were Postal Service vehicles (Jacobs Dep. 25:10-27:22). But that information was not communicated to Sansone, and it is unclear on the record whether Sansone would have known that fact himself or whether ordering other vehicles to move any time that he had difficulty parking would have been a workable solution. In any case, Jacobs had made Branch aware of Sansone's needs for both (1) ample space to let down his ramp and (2) an accessible entrance to the facility (P.G. St. ¶ 26).

---

[8] Sansone was aware that Branch was offering him her own reserved space, but it is not clear when he became aware of that offer (Sansone Dep. 140:24-141:11). That fact is ultimately irrelevant because Sansone claims that none of the spaces in the MV Office area was large enough to accommodate Sansone's ramp.

To provide an interim solution, Sansone's direct supervisor von Rhein instructed Sansone to continue parking as he always had until the Postal Service came up with a more permanent arrangement (P.G. Resp. ¶ 42). Neither Jacobs nor Branch had apparently consented to that (id.).

On September 26 Sansone followed up on the parking matter with Jacobs (P.G. St. ¶ 28). Jacobs told him that Branch still insisted that he park in the employee lot or in the MV Office area, but that Sansone should still use the entrance he had previously used on the west side of the building (id.). Now however Branch says that her instruction to use the entrance on the west side was a mistake because parking in one location and traveling such a distance to enter the BMC would have been unsafe (S. Resp. ¶ 29). For his part Sansone contends that such a switched position creates the inference that Branch proffered what she now concedes to have been an impractical arrangement as a way to satisfy Sansone's expressed need for an automated doorway (S. Resp. ¶ 29).

Sansone escalated the matter by turning to Stephen Greiser ("Greiser"), chair of the Reasonable Accommodation Committee, on September 27. When he received no reply, Sansone followed up with another communication the next day (P.G. St. ¶ 31). Greiser then responded that he was "working on it" (id.). On October 2 Branch saw that Sansone was parking in the same space as before and told Jacobs that she would tow Sansone's car if he did not move it (P.G. St. ¶ 36). After Jacobs relayed that threat to Sansone he drove home without communicating with Branch (id. ¶ 37). That was the last day that Sansone reported to work (id.). Instead he requested an appointment with an Equal Employment Opportunity dispute resolution specialist on October 5 (id. ¶ 38).

On October 3 Jacobs had sent an e-mail to Sansone's work address stating that he could park in the employee lot and that the guard on duty would open the doors for him. Sansone

received that e-mail no later than October 18, when von Rhein forwarded it to his personal e-mail account (S. Resp. ¶ 39). Although that offer would provide Sansone with assistance in entering the facility, it did not address his request for a reserved parking space. Moreover, according to Sansone, having the security guard open multiple doors for him would have been impractical. Entering the facility required that he go through several sets of doors, and a security guard would have had to leave his station to open them for Sansone (S. St. ¶ 73). But Sansone did not voice any objections to that proposal because his "mind was made up that that was enough" (S. Dep. 164:6-164:8; S. Resp. ¶ 39).

On October 18 Greiser followed up and requested additional medical information about Sansone's condition and specific limitations (id. ¶ 75). Sansone never responded to that request (S. Resp. ¶ 42). Instead he told von Rhein to tell Greiser to stop pursuing the matter (P.G. St. ¶ 43). On October 28 Sansone decided to pursue disability retirement due to an exacerbation of his multiple sclerosis symptoms (S. Resp. ¶¶ 44), which he alleges had been brought about by the impact of the dispute on his already frail condition (see S. Resp. ¶¶ 42-44; P.G. Resp. ¶ 65). As late as November 30, 2011 the Postal Service's lawyer expressed a willingness to continue discussing parking accommodations (P.G. St. ¶ 46). Sansone's official severance occurred on April 9, 2012 (id. ¶ 1).[9]

**Failure To Accommodate**

Federal employees, including Postal Service employees, must bring their disability discrimination claims under the Rehabilitation Act of 1973 (Section 701 et seq.). Courts assess such claims by applying ADA standards and caselaw (Scheerer v. Potter, 443 F.3d 916, 918-19

---

[9] Sansone took paid leave for at least six weeks after October 2, and he then remained "on the payroll" (but without a salary) until April 2012 (id.).

(7th Cir. 2006)). To prevail on his failure-to-accommodate contention Sansone must prove (1) that he was a qualified individual with a disability, (2) that the Postal Service was aware of the disability and (3) that the Postal Service failed to accommodate his disability reasonably (Ekstrand v. Sch. Dist. of Somerset, 583 F.3d 972, 975 (7th Cir. 2009)). That third element requires Sansone to prove that he attempted to engage in an "interactive communication process . . . to determine a reasonable accommodation" and that the Postal Service "was responsible for any breakdown that occurred in that process" (id. at 975-76).

Neither side disputes the fact that Sansone was a qualified individual with a disability, at least while he was actively working for the Postal Service and requested an accommodation. Instead the parties' dispute centers around whether the Postal Service failed to accommodate Sansone reasonably. Sansone argues that he is entitled to summary judgment because the Postal Service should have engaged in an interactive process <u>before</u> it revoked his pre-existing parking accommodation, while the Postmaster General contends that he is entitled to summary judgment both because Sansone abandoned the interactive process and because in any event the Postal Service had offered Sansone a reasonable accommodation.

**Duty To Engage in an Interactive Process Before Revoking an Existing Accommodation**

Sansone argues that the Postal Service had an obligation to engage in an interactive process <u>before</u> it revoked his right to park between docks 29 and 30. To that end Sansone invokes what he calls "a principle of disability law that is implicit in the case law" (S. Mem. 12-13):

> When a disabled employee has been provided with a reasonable accommodation, an employer, before it revokes that accommodation, must engage with the employee in a good faith interactive process to determine if the accommodation should be revoked.

Whether or not that is a proper articulation of the law, Sansone's summary judgment argument rests on a fatal premise: that his pre-existing accommodation was necessarily reasonable. Although Sansone asserts that he never had any safety problems, Branch determined that parking between docks 29 and 30 posed a safety risk. And obviously the fact that no accident had occurred previously does not necessarily refute the position that there was a <u>risk</u> of accident. So on the premise favoring the Postmaster General's position that the space was in fact unsafe, as is appropriate for purposes of Sansone's summary judgment motion, the Postal Service had the right to direct him to park elsewhere -- it was under no legal obligation to wait until it had struck a deal with Sansone before directing him out of the zone of danger. That undercuts Sansone's effort to call to his aid this Court's decision in <u>Isbell v. Crane, Inc.</u>, 30 F. Supp. 3d 725, 734 (N.D. Ill. 2014), where this Court held that an employer's sudden revocation of a pre-existing accommodation violated the ADA. Nothing in that case suggested that it was <u>unreasonable</u> to continue the pre-existing accommodation.[10] In sum, Sansone's motion is denied.

**Abandonment of the Interactive Process and Provision of Substitute Accommodations**

On the obverse side of the same coin, the Postmaster General argues that he is entitled to summary judgment on the ground that it was Sansone and not the Postal Service who abandoned the interactive process and that in any case the Postal Service offered Sansone a reasonable accommodation. But a reasonable factfinder could determine both that the Postal Service caused the breakdown and that it failed to offer Sansone a reasonable accommodation.

---

[10] Of course Sansone remains free to counter the Postmaster General's position by pointing to Branch's now concededly unreasonable directive, already referred to and discussed again in the next section, as supporting Sansone's failure-to-accommodate-reasonably position. But resolution of that dispute is for the factfinding jury, not for a judge as a matter of law.

As the **Facts** section of this opinion has shown, Sansone clearly articulated his needs at the outset: a space that would be large enough for him to let down his ramp and an accessible entrance. Branch was aware of those two requirements, yet she repeatedly insisted that Sansone park in a general handicap spot or in the MV Office area -- spaces that, according to Sansone's version of the facts, did not accommodate his expressed needs because neither of those two options guaranteed that he would have a spot with sufficient room to let down his ramp.[11]

As for allocating responsibility for the breakdown of the interactive process, it is true that Sansone ultimately decided to leave work at the Postal Service. But the fact that an employee resigns after his employer does not accommodate him adequately does not mean that he is necessarily tagged with that burden (see EEOC v. Sears, Roebuck & Co., 789 F.3d 789, 805-06 (7th Cir. 2005)). Nor does the fact that Sansone refused to answer the Postal Service's request for medical documentation necessarily make him responsible. Indeed, EEOC guidelines state that it is inappropriate for an employer to ask for documentation in response to a request for reasonable accommodation where "both the disability and the need for reasonable accommodation are obvious" or where "the individual has already provided the employer with sufficient information to substantiate that s/he has an ADA disability and needs the reasonable accommodation requested" (EEOC Compliance Manual (BNA) § 902:156).

Here it was well known that Sansone was disabled and that he needed a special parking accommodation. In addition, Sansone asserts that in every year since at least 1999 he had

---

[11] Although the Postmaster General characterizes Sansone's fear that a spot would not be available as speculative, Sansone testified that there were only a few spaces that were large enough for him to let down his ramp and that the spaces "get taken up by anybody and everybody" (Sansone Dep. 224:24).

submitted FMLA paperwork describing the fact that he had multiple sclerosis (P.G. Resp. ¶ 26), even though the Postmaster General admits that only for summary judgment purposes.

In any event, the entire purpose of the interactive process is for the employer to determine an appropriate accommodation -- as <u>Bunn v. Khoury Enters., Inc.</u>, 753 F.3d 676, 683 (7th Cir. 2014) has put it, "there is no separate cause of action for a failure of that interactive process." Indeed, EEOC regulations provide only that "'it <u>may</u> be necessary for the [employer] to initiate an informal, interactive process with the [employee]' to determine an appropriate accommodation" (<u>id.</u>, citing 29 C.F.R. § 1630.2(o)(3)).

Here Sansone clearly made the Postal Service well aware of what, in practical terms, he needed to get to work each day: a parking spot that allowed him to leave via his wheelchair ramp and an accessible entrance. While it is certainly true that "an employer is not required to provide the exact accommodation requested" (<u>Cloe v. City of Indianapolis</u>, 712 F.3d 1171, 1178 (7th Cir. 2013)), it is equally true that the employer is under an obligation to provide a <u>reasonable</u> accommodation that accounts adequately for the employee's limitations. Because Sansone conveyed his limitations, a reasonable factfinder -- with Sansone's version of the facts taken as true for summary judgment purposes -- could conclude that the Postal Service never offered him an arrangement that reasonably met his needs.

In response to the Postmaster General's motion, Sansone raises a new argument that he did not advance in his own summary judgment motion: that the Postal Service, independently of any obligation to engage in an interactive process <u>before</u> revoking Sansone's accommodation, also failed in its duty to engage in an interactive process with Sansone <u>after</u> it did so. Whether or not that is true, a question remains as to whether the Postal Service offered Sansone a reasonable

accommodation.  In short, summary judgment is not warranted on Sansone's failure-to-accommodate contention.

**Damages for a Failure To Accommodate**

As a potential second string to his bow in challenging Sansone's failure-to-accommodate contention, the Postmaster General argues that even if he were liable, he would not owe damages because of the good faith provision applicable to actions under Section 791, which has been held to be the exclusive remedy for disability discrimination in employment by the Postal Service and other federal agencies (Mannie v. Potter, 394 F.3d 977, 982 (7th Cir. 2005) and cases cited there).  In actions brought under Section 791, Section 794a(a)(1) incorporates by reference the remedies (including monetary damages) made available by Title 7 of the Civil Rights Act (Lane v. Pena, 518 U.S. 187, 193-94 (1996)).  In turn 42 U.S.C. § 1981a(a)(3) treats with those remedies in failure-to-accommodate actions, and it provides that damages are unavailable "where the covered entity demonstrates good faith efforts, in consultation with the person with the disability who has informed the covered entity that accommodation is needed, to identify and make a reasonable accommodation that would provide such individual with an equally effective opportunity and would not cause an undue hardship on the operation of the business."

While Sansone's case is far from clear-cut, his claim for damages survives summary judgment because a reasonable factfinder could determine that the Postal Service failed to demonstrate the requisite good faith.  Sansone requested an accommodation in mid-September.  Rather than resolve the matter promptly, the Postal Service continued to present Sansone with the same two options and then, when Sansone followed his own supervisor von Rhein's instructions, Branch threatened to tow his vehicle rather than approaching him immediately in an effort to find a solution.

What has been said to this point does not necessarily bring Sansone home free, for the Postmaster General urges that Sansone's request for all pay and benefits should be dismissed because he filed for disability on October 28 and had thus declared his own inability to work. On that premise Sansone was not a "qualified individual" who was entitled at that point to a reasonable accommodation. Because Sansone had received pay (or paid leave) until he declared his disability, the Postmaster General contends that Sansone is not entitled to any damages -- including what his motion characterizes as back pay, lost benefits and front pay -- arising out of an alleged failure to accommodate after that date.

But it is undisputed that before his October 2 departure Sansone <u>was</u> qualified to work and <u>was</u> entitled to a reasonable accommodation -- and that being so, a factfinding jury could reasonably find that the Postal Service had failed to accommodate Sansone <u>before</u> that date.[12] Whether someone is a "qualified individual" is assessed at the time of the relevant events (see, e.g., <u>Ekstrand</u>, 583 F.3d at 975). If a jury should find that the Postal Service failed to accommodate Sansone before his departure, Section 791 entitles Sansone to all of the remedies available under Title VII, including any appropriate equitable relief, arising out of a failure to accommodate (42 U.S.C. § 2000e-5(g)). For example:[13]

---

[12] Contrast <u>Feldman v. Am. Mem'l Life Ins. Co.</u>, 196 F.3d 783, 791 (7th Cir. 1999), where the employee said that she was totally disabled in a disability benefits application and her employer <u>later</u> denied her a reasonable accommodation, with the employee's ensuing lawsuit reversing course by claiming that she had been able to perform the essential functions of her job with or without reasonable accommodations.

[13] No effort is made here to be exhaustive in terms of defining possible damages payable to Sansone . That entire subject, on which the parties have been like ships that pass in the night until now, will have to be dealt with for purposes of the trial on the failure-to-accommodate subject.

1. If Sansone's continued receipt of income from the Postal Service operated to deprive him of unused leave pay that he would otherwise have received under a normal departure from the Postal Service's employ, that might be compensable if he were to prevail on his failure-to-accommodate contention.

2. Sansone might perhaps also be found compensable for the period that he assertedly remained "on the payroll" -- but was not paid -- from October 2011 to his severance date in April 2012 (see n.9).

3. Sansone alleges that the dispute with the Postal Service caused him so much distress that he was unable to continue working, and if that is true he may be entitled to recover damages for income that he lost as a result.

**Constructive Discharge**

To prevail on a claim for constructive discharge, Sansone must prove "that a hostile work environment existed and that the abusive working environment became so intolerable that h[is] resignation qualified as a fitting response" (Ekstrand, 583 F.3d at 977) (internal quotation marks omitted). Of course the events leading up to one's resignation are relevant in evaluating a claim for constructive discharge.

While Sansone has met his burden to survive summary judgment on his failure-to-accommodate contention, he has not done so as to his claim of constructive discharge because he has not shown that the Postal Service had "made the working conditions so intolerable as to force a reasonable person to leave" (EEOC v. Sears, Roebuck & Co., 233 F.3d 432, 440 (7th Cir. 2000). At the time Sansone resigned from his position, the Postal Service -- through its lawyer -- had expressed a willingness to continue discussing parking accommodations. Even if

Sansone felt that those were half-hearted offers, a reasonable person would not have felt that his only option at that point was to resign.

It is true that the Postal Service may ultimately have failed to provide a reasonable long-term parking solution if given the opportunity. But Sansone has offered no evidence to suggest that he was without temporary short-term solutions -- for example, he could have driven into work and parked in an open handicap space in the parking lot or, if all those spots were full, he could have requested that the Postal Service help him to make room. Sansone has simply not surmounted the high hurdle that is generally required in constructive discharge cases (Ekstrand, 972 F.3d at 977-78).

## Conclusion

For the reasons stated in this opinion, Sansone's motion is denied in full, while the Postmaster General's motion is denied as to Sansone's failure-to-accommodate contention but is granted as to his claim of constructive discharge. This action is set for a status hearing at 9 a.m. April 24, 2015 to discuss the procedures and timetable for a trial as to the Postmaster General's asserted failure to accommodate Sansone's disability.

_____
Milton I. Shadur
Senior United States District Judge

April 14, 2015