# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **ANTHONY SANSONE**, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 13 C 3415 |
| **MEGAN BRENNAN**, Postmaster General, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Anthony Sansone ("Sansone") began working for the United States Postal Service ("Postal Service") more than 35 years ago, a career that culminated in his highly commendable service over a period in excess of three decades at the Postal Service's very large Bulk Mail Center (the "Center") in Forest Park, Illinois and that in turn led to his 1997 promotion to the position of Supervisor of Maintenance at that major facility. Sansone's excellent performance of that further responsibility continued without incident -- as this Court's April 14, 2015 memorandum opinion and order stated as an uncontroverted fact in the parties' cross-motions for summary judgment:

> In his entire time with the Postal Service Sansone never received any kind of warning or reprimand about his job performance.

Indeed, Sansone's admirable record merits extra kudos because he has suffered from a major disability, multiple sclerosis, that caused him to lose virtually all use of his legs in 1999, rendering him wheelchair-bound. But that misfortune did not impair his job performance -- instead, as the same April 2015 opinion went on to recount the uncontroverted facts:

> After he lost the use of his legs, Sansone drove to work each morning in a specially equipped van that he could operate entirely with his hands and that had a ramp that deployed from the passenger side to enable Sansone to enter and leave

the van in his wheelchair. To accommodate the van and ensure that Sansone could easily enter and leave the BMC, the Postal Service permitted him to park in a specific space on the western side of the BMC between dock doors 29 and 30. That space was special because it was next to a marked crosswalk, leaving sufficient space to deploy the wheelchair ramp. It was also adjacent to a loading ramp that extended from ground level to an automated doorway, permitting Sansone to come into and go out of the building with ease. Once in the building Sansone switched from his wheelchair to a motorized scooter, which facilitated his ability to move around the BMC and to operate manual doors.

That arrangement continued, also without incident, for a dozen years from 1999 to 2011. But that entirely workable accommodation to the existence and circumstances of Sansone's disability came to an abrupt halt when the Postal Service's newly-minted Plant Manager Ruby Branch ("Branch"), who had worked at the Center only since 2010, saw Sansone's van at its long-permitted parking space and, after an inquiry that identified the van's owner, immediately ordered that Sansone's parking in that space was prohibited. That snap decision[1] was never retracted, and the trial jury verdict in Sansone's favor plainly reflected <u>its</u> reasonable <u>judgment</u> that Branch's later proffered support for her decision essentially amounted to "don't trouble me with the facts -- my mind is already made up."[2]

---

[1] That figure of speech is used here rather than the more common "snap judgment" because the word "judgment" normally connotes a conclusion reached on an informed basis after full consideration of the reasons supporting or not supporting the conclusion. In this instance, however, Branch simply reacted without looking into the situation.

[2] There is no need to deal in any detail with the parties' respective submissions on the subject of a reasonable accommodation for Sansone's acknowledged disability, for those positions were put before the trial jury and were reasonably resolved in Sansone's favor and against the government. It is worth pointing out, however, that the government's counsel (like Branch) approached that subject from the perspective of the asserted reasonableness of Branch's post-snap-decision rationalization of some suggested accommodations (each of which had flaws not present in the accommodation under which Sansone had functioned successfully for a dozen years), rather than being able to negate the reasonableness of the existing accommodation that Branch had summarily revoked without due consideration.

With the substantive merits of the litigants' dispute having been resolved by the jury in Sansone's favor, the quantification of his recovery is the responsibility of this Court. On that score the parties have trained their sights on the extent, if any, that the government's obligation should be reduced because of Sansone's receipt of funds emanating in part from the government -- a question that they have categorized in terms of whether and to what extent the "collateral source" doctrine should apply. What follows here is an analysis of the elements of recovery to which Sansone is entitled -- and as will be seen, in that context the parties' focus on "collateral source" issues makes little sense.

That analysis must begin with the fact that the funds received by Sansone emanated from Sansone himself as well as from the government -- under the Civil Service Retirement System ("CSRS") devised by the government, as well described in the first three paragraphs of the "Parties' Stipulation Regarding CSRS" (Dkt. No. 126):

1. The Civil Service Retirement System ("CSRS") and the Federal Employees' Retirement System ("FERS") are defined benefit pension plans for civilian federal employees, all of whom contribute to a general U.S. Treasury fund that is managed and invested by the U.S. Office of Personnel Management ("OPM").

2. CSRS takes the place of Social Security for employees who are covered by its provisions. All wages paid by the federal government to civil servants covered by CSRS are not assessed Social Security taxes and recipient employees do not accrue credits toward Social Security benefits for these wages.

3. Since 1969, CSRS-covered employees have contributed 7 percent of their pay to CSRS during the lifetime of their employment. Each employing agency is required to contribute an additional amount determined by statute, and subject to OPM interpretation, to fund its employer obligations to the CSRS fund.

And as will be seen, the contributions from both sources are an integral part of government employees' (here Sansone's) compensation, to which the notion of "collateral source" simply does not apply.

Surprisingly, both Sansone and the Postal Service seek to rely on the decision in <u>United States Can Co. v. NLRB</u>, 254 F.3d 626 (7th Cir. 2001) in claimed support of their opposing arguments on the applicability or nonapplicability of the "collateral source" doctrine. But what is most significant for current purposes is the recognition in <u>United States Can</u>, <u>id.</u> at 633-34 of the Court of Appeals' earlier decision in <u>EEOC v. O'Grady</u>, 857 F.2d 383, 391 (7th Cir. 1988), which teaches in relevant part:

> We do not agree with defendants' arguments that the pension payments in this case should be offset. First, the pension benefits may be viewed as <u>earned</u> by the claimants and therefore not paid by the employer at all. Like an insurance policy provided by an employer, the pension benefits here were part of the claimants' compensation. <u>See In re Air Crash Disaster Near Chicago, Illinois, On May 25, 1979</u>, 809 F.2d 304, 308 (7th Cir. 1986) ("[I]nsurance was as much a part of the compensation [the former employee] received from his employer as were his salary, fringe benefits, <u>and pension benefits</u>") (emphasis added).
>
> \*   \*   \*
>
> The Sheriff's office would have had to contribute to the Retirement Board and pay claimants' salaries if it had not wrongfully retired the corrections officers. The collateral source rule should not afford a "discrimination bonus" by allowing an adjudicated violator of the ADEA to pay less than it would have paid had it acted lawfully.

With that established as the truly appropriate background, the analysis here begins with the fact that but for Branch's arbitrary and uncalled-for intervention Sansone would have continued in active employment as the Center's Supervisor of Maintenance. In that respect Sansone's "Memorandum on Collateral Source Issue" (Dkt. No. 136) states at page 7:

> Mr. Sansone honestly does not know when he would have retired if not for the events that are the subject of this lawsuit. As shown at trial, he loved his job -- it

> was the major source of his identity and the resource that made it possible for him to overcome tremendous adversity.
>
> But a best estimate is that Mr. Sansone would have retired on or about January 20, 2023, just short of his 65th birthday. At that point he would have earned enough credits so that his pension would have been equal to 80% of his highest three years of earnings. See The Parties' Stipulation Regarding CSRS, par. 30 (filed 4/4/17).

Nothing in the evidence counters that candid and totally plausible statement. And viewed in that light, that component of Sansone's entitlement comprises two parts: the portion ending with the date of judgment and the portion recoverable for the period from the date of judgment through January 20, 2023.

Indeed, the Postal Service's position vis-a-vis Sansone is even less favorable than the earlier-quoted language from O'Grady. Remember that one result of Branch's (and hence the Postal Service's ) hasty -- and quite arbitrary -- conclusion that triggered Sansone's retirement was the Postal Service's nonpayment thereafter of any amount to the CSRS on Sansone's account (for the Postal Service no longer had a continuing obligation to make such payments as to someone who had become an ex-employee). Hence conferring a "discrimination bonus" on the Postal Service under that circumstance would plainly distort any "collateral source" notion beyond recognition.

Instead, to see whether any arguable application of the "collateral source" doctrine could play a role in the damages payable by the government for the high-handed and inflexible termination of the decade-long reasonable accommodation under which Sansone was already functioning, it is necessary to determine the amount that Sansone would have been entitled to receive before opting to receive his pension at the totally plausible date identified in Sansone's Dkt. No. 136 memorandum. And in that regard the CSRS established by the government in lieu

of social security would have continued to require the Postal Service to provide Sansone with ongoing employment income at the expected rates for his full active employment.

Thus for the period from Sansone's wrongful termination to the date of entry of judgment in this action, his damages entitlement is 93% of his full compensation[3] that has been paid to him during the same period -- an amount to which he would not have been entitled because he would have remained an active employee during that period. That net figure should be enhanced by interest (presumably at the prime rate -- see O'Grady, 857 F.2d at 391-92).

Then for the period from the date of entry of judgment in this action through Sansone's January 20, 2023 target date for his retirement from active service, his recoverable damages would amount to the present value of 93% of a projected level of compensation for his position as Supervisor of Maintenance. And finally, because this opinion's construct up to this point has charged Sansone with the 7% annual contributions required to fund his credit to support a pension amounting to 80% of the average of his highest three years of earnings, that sum must be added to the already-outlined recovery.

But it must be recognized that quantifying that final portion of Sansone's entitlement in those terms would involve a purely hypothetical combination of two factors that cannot be ascertained now -- and although the following resolution might perhaps be viewed as irregular, there seems to be no reason why this aspect of the case cannot be deferred until the operative facts -- the annual pension amount and Sansone's lifespan -- are actually known. Accordingly, unless either of the litigants interposes an objection to this component of Sansone's recovery, the

---

[3] That takes into account Sansone's obligation to contribute 7% of his compensation under the terms of the CSRS.

payment of each installment of Sansone's post-January 20, 2023 pension will be deferred until it is actually due to him.

**Conclusion**

This opinion has concededly broken new ground in a number of respects, although this Court has carefully sought to place each of its aspects on a solid legal foundation. Unfortunately the delay in the production of this opinion has been the unavoidable result of this Court's unanticipated surgery and consequent post-surgery rehabilitation process, so that the next step must be the receipt of the parties' submissions as to the appropriate calculation of Sansone's recovery in this action. To that end the parties are directed to tender their respective submissions on or before October 5, 2017.[4]

_____
Milton I. Shadur
Senior United States District Judge

Date: September 7, 2017

---

[4] Meanwhile Sansone's motion seeking a ruling as to "collateral source" (Dkt. No. 127) is of course granted by the issuance of this opinion, and this Court retains jurisdiction over this action.